**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 24-cr-386** |
| | : | |
| **THOMASZ SZABO,** | : | |
| a/k/a "Plank," "Jonah," and "Cypher" | : | [redacted] |
| | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America respectfully submits this sentencing memorandum in the above-captioned case. For the reasons that follow, the government recommends a sentence of **57 months** of imprisonment.

## I. FACTS

As summarized in the Statement of Offense, ECF 26, this case involved a lengthy pattern of conduct by the defendant and others, who together subjected numerous victims to harassment, intimidation, and endangerment. They did so by making hoax reports to U.S. law enforcement agencies – sometimes of a fictitious violent emergency that intended to trigger a tactical police response ("swatting"), and sometimes of a fictitious explosive devices intended the trigger the evacuation of a premises (bomb threats).

The defendant was a prominent member of on online community with its own distinctive subculture, an element of which was "trolling," or trying to provoke reactions from others for entertainment value. Trolling could be as simple and relatively innocuous as sending offensive images, or expressing an inflammatory position on some issue so that others would become agitated while arguing in response. Trolling could be directed at people the "troll" (i.e., the person trolling) dislikes, but it could also be directed at total strangers, purely for the perceived comedic

value of the reaction. In the online circles that the defendant frequented, successful trolling (that is, trolling that elicits an especially extreme reaction) is a way to increase one's stature and notoriety.

Around 2018, the defendant began forming his own chat servers for like-minded people to gather for camaraderie and idle banter. As the organizer of these groups, the defendant had the ability to invite others, to remove others, and generally to moderate the discussion. Trolling was a major theme, with the members (especially the defendant as leader) sharing the results of their trolling attempts with others in the group. To increase the popularity of his chat groups and attract greater membership, the defendant began engaging in more extreme forms of trolling, including prank calls. The trolling often had a political valence, targeting people or groups that the defendant and his followers believed would react especially strongly if trolled on an issue related to their politics. Although the defendant and some of his followers lived in foreign countries, many of their trolling targets were in the United States.

Before long, the defendant's trolling escalated to include swatting and bomb threats. Despite (or because of) the fact that they resulted in far greater harm to the victim and society, these activities offered much more entertainment value to the defendant and his followers, since swatting and bomb threats often resulted in an observable real-world impact. For example, after making a bomb threat against a public institution, the defendant could share news stories and video footage documenting the evacuation of the premises. Similarly, when selecting swatting victims, the defendant and his followers often targeted internet "streamers" who broadcast live video of themselves playing video games, discussing politics, or otherwise engaging in some activity for an online audience. The goal was to provoke a police response – ideally an actual SWAT team –

that would arrive at the victim's home while the broadcast was in progress, allowing the perpetrators to watch the victim's terrified reaction in real time.

Following the defendant's example, other members of his groups became active swatters themselves. These co-conspirators were junior to the defendant in the group's social hierarchy, and they also tended to be younger. The defendant's followers included Nemanja Radovanovic (the co-defendant in this case), living in Serbia; and Alan Filion (charged separately in the Middle District of Florida),[1] living in the United States. As of December 2023, Filion (who was then 17) and Radovanovic (who was then 20) had both been followers of the defendant (who was then 26) for some time.

Beginning on December 24, 2023, and continuing into January of 2024 – a time apparently chosen to correspond with the holiday season – Radovanovic and Filion perpetrated an intensive sequence of swatting and bomb threats that targeted at least 25 Members of Congress or family members of Congress; 6 then-current or former senior U.S. Executive Branch officials, including multiple cabinet-level officials; at least 13 then-current or former senior federal law enforcement officials, including the heads of multiple federal law enforcement agencies; multiple members of the federal judiciary; at least 27 then-current or former state government officials or family members of such officials; at least 4 religious institutions, and multiple members of the media. This spree of swatting and bomb threats (hereinafter "the holiday swats") also victimized members

[1] *United States v. Alan Filion*, MDFL no. 6:24-cr-261. Filion was a juvenile at the time of his offense conduct but pleaded guilty as an adult. According to admissions as part of his guilty plea, Filion "became a serial swatter for both profit and recreation," and made approximately 375 swatting calls between August of 2022 and January of 2024, targeting "religious institutions, high schools, colleges and universities, government officials, and numerous individuals across the United States." *Filion*, ECF 19 at 23-24. Filion made his swatting into a small business, marketing a variety of services like causing a "major police response to the house" for fees ranging from $30 to $75. *Id.* at 24.

of the general public who do not appear to have been the intended targets of the swatting calls (for example, people who lived at addresses formerly occupied by public officials).

Based on the information known to the government, the defendant does not appear to have directed or supervised the specific instances of swatting perpetrated by Radovanovic and Flion as part of the holiday swats. However, over the course of approximately 11 days leading up to the holiday swats, the defendant had directed Radovanovic to swat multiple politically vocal social media users, some of whom had large followings. The day before the holiday swats began, the defendant told Radovanovic that their swatting victims should include people on both sides of the American political spectrum because "we are not on any side." After making a bomb threat against Victim Religious Institution 1, Radovanovic sent the defendant a link to a news story about the evacuation of the church during Christmas Eve services. He said, "[Cyberstalking Victim 1] making bomb threats all the way in oklahoma… thoughts[?]." This was an oblique way of Radovanovic's signaling his involvement in the hoax, since Cyberstalking Victim 1 was a person who was regularly subjected to harassment by Szabo, Radovanovic, and their associates, and whose name they often invoked as an inside joke.

On January 19, 2024, Romanian police searched the defendant's home pursuant to a mutual legal assistance request from the United States, and the defendant agreed to an interview with agents of the U.S. Secret Service (USSS) in which he admitted to his involvement in swatting. He was subsequently charged and pleaded guilty.

## II. SENTENCING GUIDELINES

Pursuant to the plea agreement, the government recommends that the Court apply the following guidelines provisions:

| | | |
|---|---|---|
| U.S.S.G. § 2A6.1(a)(1) | Base Offense Level | 12 |
| U.S.S.G. § 2A6.1(b)(2)(A) | More than two threats | +2 |
| U.S.S.G. § 2A6.1(b)(4)(A) | Substantial disruption of public/ governmental functions and services | +4 |
| U.S.S.G. § 3A1.2(b) | Official victim | +6 |
| U.S.S.G. § 3B1.1(a) | Aggravating role | +4 |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | Total | **25** |

The agreed-upon guidelines in the plea agreement do not include a multiple-count adjustment. The Pre-Sentence Report (PSR) recommends counting each of the conspiracy's three object offenses as a separate count of conviction, PSR ¶ 42, which would result in a 3-level multiple-count adjustment, PSR ¶ 67.

On the specific facts of this case, the government submits that a multiple-count adjustment is not required. The conspiracy constituted an agreement to engage in an ongoing pattern of swatting and bomb threats against numerous victims for the purpose of harassing them. The conspirators agreed to pursue that objective using means that would constitute violations of three different statutes: 18 U.S.C. § 844(e) (because the swatting calls sometimes involved threats of explosives); 18 U.S.C. § 875(c) (because the swatting calls sometimes involved interstate threats to injure people); and 18 U.S.C. § 2261A (because the swatting calls sometimes repeatedly targeted the same person). Because these offenses constitute three distinct ways of pursuing a single objective, rather than three distinct objectives in themselves, the government believes that it is

appropriate to treat them as "closely related" pursuant to U.S.S.G. § 3D1.2, resulting in the guidelines range the parties contemplated in the plea agreement.

## III. SECTION 3553(a) FACTORS

The factors listed at 18 U.S.C. § 3553(a) support the government's recommended sentence. In particular:

### A. Nature and circumstances of the offense.

The defendant engaged in a years-long pattern of malicious hoax reports. He was the leader of a conspiracy that culminated in a "swatting rampage" by subordinates that targeted a staggering number of public officials and other victims during the 2023 holiday season. This protracted course of conduct was exceptionally harmful, in multiple ways.

First, it inflicted significant emotional trauma on its proximate victims, the individuals and families whose homes were swatted. The victim-impact statements vividly portray the experience of being awoken in the night, "met with blinding flashlights and shouted commands," being brought outside shoeless in the December cold to have "rifles with laser sights pointed at [one's] chest," and being told that one's "son was probably dead in the backyard." The statements also show the lasting effects of being victimized in this way: altered sleep habits, recurring nightmares, children afraid of the sound of knocking at the door, and "forever carry[ing] around the burden of distrust." Although most of the victims declined to submit statements, the Court can safely infer that many other victims suffered similar harms. Indeed, the very choice not to submit a statement is reflective of a reasonable fear that doing so would only draw attention to oneself and increase the likelihood of being swatted again (despite the government's having assured victims that their names and personal information would be redacted).

Second, the crime caused the waste of incalculable public resources. Over and over, police departments and other first responders were hijacked by the defendant and deployed to fictitious emergencies. As a result, fewer personnel and resources were available to respond to real emergencies.

Third, the crime caused fear among the broader public. Because so many prominent public figures were victimized, the holiday swats received significant media attention.[2] It was bad enough that members of the public were made to fear that they could fall victim to the seemingly out-of-control surge of swatting. But the political nature of the targets made matters worse, leading many reasonably to suspect that the crime had ideological and even terrorist motives. Public figures who were swatted during this timeframe made comments to the media such as, "What happened to me was designed to send a message to be silent," "I think it's meant to silence people and keep them from exercising their constitutional rights and participating in the political sphere,"[3] and "This is an assassination attempt."[4] Regardless of whether it was the conspirators' purpose to chill civic participation, that was the natural and foreseeable result of their actions. As one victim impact statement explains, these "swatting incidents sent a terrifying message to other election officials across the state and nation – making some other officials feel less safe and introducing an additional challenge in recruiting election officials to work in elections administration."

In sum, this was a serious crime.

---

[2] *See, e.g.*, CNN, "High-profile political figures are the targets in the latest wave of 'swatting' incidents. Why the trend is so alarming" (Jan. 15, 2024), *available at* https://www.cnn.com/2024/01/14/us/swatting-incidents-trend-explained.

[3] *Id.*

[4] CBS News, "Swatting calls target more than a dozen public officials since Christmas. One says, 'This is an assassination attempt.'" (Jan. 19, 2024), *available at* https://www.cbsnews.com/news/swatting-attacks-public-officials-targeted/.

**B. History and characteristics of the defendant.**

Although the defendant has no record of arrests or convictions, this is not his first time being caught engaging in this type of conduct. After he committed a bomb threat against the 2021 Presidential Inauguration (admitted at paragraph 8.b of the Statement of Offense), Romanian police interviewed the defendant based on a lead from the USSS. He admitted to officers that he had helped make the threat, and he stated that he would not do so again. The defendant's prompt resumption of swatting and bomb threats, despite this intervention by law enforcement, is an aggravating feature of his history and characteristics.

[redacted]

[redacted]

[redacted]

[Page content redacted]



**C. Need for deterrence and to protect the public.**

There is a strong need for deterrence in this case. As reflected in the facts summarized above, this was not a crime of greed or passion. Instead, the defendant and his co-conspirators acted largely for their own amusement: they found it an entertaining pastime to watch the destructive results of their conduct. Their choice to commit such serious crimes for such seemingly frivolous reward indicates that they perceived no serious risk of facing meaningful punishment for their actions. A substantial sentence in this case is necessary to recalibrate that risk-reward balancing for the participants in this offense and for others worldwide who might be inclined to take up similarly pernicious online hobbies.

The government's recommended sentence would also protect the public by preventing the defendant from engaging in swatting during his incarceration.

**D. Avoiding unwarranted disparities**

In the Court's assessment of relative culpability, co-conspirator Filion is available as a point of comparison. Filion was sentenced to 48 months of imprisonment.

The government submits that the defendant and Filion are similarly situated from the standpoint of acceptance of responsibility. Regarding their roles in the offense, Szabo was the more senior member of the conspiracy, as reflected in both his conduct and his age. By the same token, Filion's youth was a mitigating factor not present in the defendant's case. Weighing in the other direction, Filion had far greater personal involvement in the holiday swats that were arguably the worst conduct committed as part of the conspiracy. As summarized above, the defendant's connection to the holiday swats was somewhat more attenuated.

Considering the above factors, on balance the defendant deserves a longer sentence than Filion's 48 months. The government's recommendation would reflect the conspirators' relative culpability and thereby avoid any unwarranted disparity.

## IV. REQUESTS FOR RESTITUTION

Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771, the government has notified victims that they may be entitled to restitution for financial losses suffered as a result of the offense. The government is in discussions with the defense and anticipates that there may be an agreement on restitution. At the time of sentencing, the government will advise the Court of any agreed-upon restitution and of any restitution issues that are not yet resolved.

## V.     CONCLUSION

For the foregoing reasons, the government recommends that the defendant be sentenced to **57** months of imprisonment.

                                                Respectfully submitted,

                                                JEANINE FERRIS PIRRO
                                                UNITED STATES ATTORNEY

By:        /s/ Conor Mulroe
             Conor Mulroe
             Assistant U.S. Attorney
             NY Bar Number 5289640
             United States Attorney's Office
             601 D Street, NW, 5th Floor
             Washington, D.C. 20530
             (202) 740-4595
             Conor.Mulroe@usdoj.gov